UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSHUA ARDOLF, ANTHONY BALDWIN, BUDDY KRUEGER, JACOB MADDEN, JNANA VAN OIJEN,<br><br>        Plaintiffs,<br><br>  v.<br><br>BRUCE WEBER,<br><br>        Defendant. | Case Number: cv-18-12112<br><br>FIRST AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

      Plaintiffs Joshua Ardolf, Anthony Baldwin, Buddy Krueger, Jacob Madden, and Jnana Van Oijen ("Plaintiffs"), by and through their attorneys, The Bloom Firm, bring this action against Bruce Weber. Plaintiffs allege upon knowledge concerning their own experience and upon information and belief as to all other matters.

## I.   OVERVIEW

    1.    Defendant Bruce Weber is a serial sexual predator who used his power in the male modeling industry to fraudulently and forcefully entice aspiring male models into engaging in abusive commercial sex acts. Bruce Weber, a photographer who has been known as the gatekeeper to success for decades in the male modeling industry, exploited his prominence and influence to manipulate men into submitting to his sexual advances in exchange for photoshoots, castings, other prospective modeling opportunities, and promises of success in the industry. Bruce Weber, now an industry pariah since the filing of a sexual harassment lawsuit and a subsequent *New York Times* exposé, engaged in sex trafficking when he used his talents as a means of assaulting countless young men. His actions destroyed lives, and his continued public denials and refusal to take accountability are a hindrance to his victims' recovery. The five Plaintiffs in this case are just some of the many young

1

men whose life and career were derailed by the vile sex trafficking acts of Bruce Weber.

## II. THE PARTIES

2. The Plaintiffs, victims of sex trafficking and molestation, have been identified by pseudonym because this matter is of a highly sensitive and personal nature, and public disclosure of their identities may subject them to further embarrassment, shame, and emotional harm. Defendant has been made aware of the Plaintiffs' identities.

3. Plaintiff Joshua Ardolf is a United States citizen, domiciled in Minnesota. He resides in North Mankato, Minnesota.

4. Plaintiff Anthony Baldwin is a United States citizen, domiciled in California. He resides in Los Angeles, California.

5. Plaintiff Buddy Krueger is a United States citizen, domiciled in Florida. He resides in Broward County, Florida.

6. Plaintiff Jacob Madden is a United States citizen, domiciled in California. He resides in Los Angeles, California.

7. Plaintiff Jnana Van Oijen is a citizen of the United States and a resident in the Netherlands, domiciled in the Netherlands. He resides in Amsterdam and maintains a residence in New York, NY.

8. On information and belief, Defendant Bruce Weber is a United States citizen, domiciled in New York. He resides in New York and Florida.

## III. JURISDICTION AND VENUE

9. This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action involves claims brought under 18 U.S.C. §1591 and §1595.

10. This Court has personal jurisdiction over Defendant Bruce Weber pursuant to New York Civil Practice Law and Rules ("C.P.L.R.") Sections 30l and 302 because Defendant Bruce Weber is located in New York, resides in New York, is licensed to do business in New York, transacts business in New York, and owns, uses, or possesses real property within New York.

11. Venue is proper in this District under 28 U.S.C. §1391(b) because Bruce Weber is domiciled in this District, the events or omissions giving rise to Plaintiff's claim occurred in this District, and Bruce Weber conducts substantial business in this District.

## IV. FACTUAL ALLEGATIONS

12. At all material times, Bruce Weber ("Weber" or "Defendant") was the most powerful and influential fashion photographer in the male modeling industry.

13. At all material times, Weber acted as the "gatekeeper" to success in the male modeling industry.

14. More than just a photographer, Weber was hired by magazines, designers, brands, and other clients to manage and control the entire casting process and directing of photoshoots and other modeling campaigns.

15. Major brands and magazines in the industry delegated complete power and control over the modeling shoots to Weber, which included deciding which models were invited for an audition, and which models were ultimately chosen for each campaign.

16. On information and belief, Weber could even bring his own chosen models to photoshoots.

17. As a result of the authority and power bestowed upon him, Weber had ultimate control over a male model's career and had the power and authority to decide which male models would achieve success in the industry, and which male models would fail.

18. Aspiring models would participate in "test shoots," in which a photographer takes photographs of the model. Photographers often decide if they want to use models in future campaigns or other jobs as a result of the test shoot.

19. Phone calls, videos chats, test shoots, photoshoots, casting calls, and auditions with Weber were all of significant value to aspiring male models.

20. Many aspiring models have a "book," which is a portfolio of their photographs that they use as a resume to show agents, photographers, and casting directors in order to get work.

21. Any photoshoot with Weber was valuable to aspiring models, because it would at the very least result in Bruce Weber photographs that models could use in their "book," which were inherently valuable because of Weber's prominence and popularity, and could enhance a model's likelihood of getting jobs.

22. A test shoot/audition with Weber was also valuable because it could result in an editorial feature in famous magazine, such as *Vogue* or *GQ*, or a modeling campaign with a famous brand, such as Ralph Lauren or Abercrombie & Fitch, which would be a significant boost to a model's career.

**Joshua Ardolf**

23. At all material times, Joshua Ardolf ("Ardolf") was an aspiring male model.

24. Ardolf met Weber in October of 2010 in New York, New York. Weber took some test shots of Ardolf in his New York office and stated that he had a few upcoming modeling jobs for which he wanted to potentially hire Ardolf.

25. In January of 2011, Weber recruited and enticed Ardolf by booking him for a French Vogue shoot in Miami, Florida. The booking made Ardolf hopeful that Weber could help his modeling career.

26. As was his *modus operandi*, Weber got Ardolf alone, under the guise of taking individual shots, and began engaging in a fraudulent "breathing exercise." During this "breathing exercise," Weber directed Ardolf to guide Weber's hand wherever Ardolf felt the "energy" on his body. Ardolf guided his hand to his chest, shoulders, head, and abdomen. Then, Weber forcibly grabbed Ardolf's genitals, and fondled Ardolf's genitals briefly before Ardolf backed away.

27. As the molestation took place, Weber told Ardolf about photoshoots he had coming up soon, which he told Ardolf he was a "top candidate for." Ardolf understood this to mean that if he cooperated with Weber's molestations, Ardolf would book future modeling jobs with Weber.

28. Weber recruited and enticed Ardolf into meeting with him alone in 2011, under the guise of taking individual shots, and sexually molested him. Weber promised that he had upcoming modeling jobs for which he could book Ardolf

4

during this encounter. Ardolf took these statements to mean that if he allowed Weber to sexually molest him, Weber would use his power and influence to make sure Ardolf was successful in his modeling career.

29. Ardolf reasonably relied upon and believed Weber's statements, in part, based upon Weber's status and power in the modeling industry.

**Anthony Baldwin**

30. At all material times, Anthony Baldwin ("Baldwin") was an aspiring male model.

31. In or around the Winter of 2009, Baldwin was invited to an Abercrombie & Fitch photoshoot in Florida. Weber was the photographer.

32. Weber recruited and enticed Baldwin by arranging to meet with him for a solo photoshoot for the campaign.

33. The invitation from Weber for a solo photoshoot made Baldwin hopeful, as it was an important career opportunity for Baldwin, so he agreed to meet Weber in the hopes that Weber would help advance his career.

34. As was his *modus operandi*, once Weber got Baldwin alone, he began engaging in a fraudulent "breathing exercise." During this "breathing exercise," Weber instructed Baldwin to put Baldwin's hand on his chest, then his stomach, and then lower and lower until Baldwin was touching his own genitals.

35. Baldwin told Weber that he was uncomfortable touching his genitals, at which point Weber told him that if he did not do what Weber wanted, then he could just go home and Weber would give the job to one of the other models who was waiting.

36. Baldwin understood this to mean that if he wanted the campaign for Abercrombie & Fitch, he needed to comply with Weber's sexual demands.

37. Baldwin reasonably relied upon and believed Weber's statements, and stayed at the photoshoot.

38. Weber told Baldwin to take off his shirt. Baldwin complied, and Weber started taking pictures of him. Weber asked him to pull his underwear hem

5

up or down, and to take his underwear off. Throughout the photoshoot, Weber would stop to do the breathing exercises with Baldwin.

39. At one point, when Baldwin had his underwear on, Weber put his camera down and walked over to Baldwin. Weber forcibly put his hand in Baldwin's underwear and touched Baldwin's genitals. Baldwin panicked and froze.

40. Weber did not feature Baldwin in the Abercrombie & Fitch campaign.

41. After the photoshoot, Weber would occasionally call Baldwin. Baldwin answered the calls because he was hoping Weber would offer him work. On the calls, Weber would ask Baldwin to send him pictures of himself in his underwear. He would ask Baldwin questions such as, "can you swim? Do you swim naked in the pool? How many girls are you having sex with?" Weber's breathing would become heavy during the calls.

42. Baldwin did not hang up on Weber because he believed that he needed to stay on the phone calls in order to get work.

43. In or around the Winter of 2010, Weber called Baldwin and offered him a modeling job for a Ralph Lauren advertisement.

44. Baldwin ultimately did not take the job, because he had a conflict. Weber called him and told him that could have chosen to ruin his career, but instead offered him work – and how dare Baldwin accept another job over Weber's offer.

**Buddy Krueger**

45. At all material times, Buddy Krueger ("Krueger") was an aspiring male model.

46. In the Fall of 2008, Krueger was invited to an Abercrombie & Fitch photoshoot in Florida, in which Weber was in charge.

47. As was his *modus operandi*, Weber got Krueger alone, and began engaging in a fraudulent "breathing exercise." During this "breathing exercise," Weber put his hand on Krueger's chest and then lowered and lowered his hand until Weber's hands were fondling Krueger's genitals.

48. As the molestation took place, Weber said to Krueger "just relax and you'll go far in this industry." Krueger understood this to mean that if he just

allowed Weber to sexually molest him, Weber would help Krueger's career in the male modeling industry.

49. Krueger's image, taken by Weber during that shoot, was used prominently in the Abercrombie & Fitch campaign.

50. In or about the Spring of 2010, Weber recruited and enticed Krueger to come to his private home/studio in Manhattan for a private shoot, often referred to in the industry as a "test shoot."

51. The invitation from Weber to come to his studio for a private photography session was an important career opportunity for Krueger, so he agreed to come to the studio in hope that Weber would help advance his career, just like Weber stated he would during the 2008 incident. This invitation instilled hope in Krueger that Weber would further Krueger's career in the modeling industry.

52. Once alone inside his studio, however, Weber again engaged in the "breathing exercise." Krueger tried stopping Weber's hand from reaching his genitals, but Weber forced his hand lower and lower until he was once again fondling Krueger's genitals. Once Weber forced his hand onto Krueger's genitals, Krueger panicked and froze.

53. Weber, seemingly aware that Krueger was not complying with his sexual advances told Krueger "you can go far, you just need a little help from me." Once again, Krueger took this statement to mean that if he allowed Weber to sexually molest him, Weber would use his power and influence to make sure Krueger found success in the male modeling industry.

54. Krueger reasonably relied upon and believed Weber's statements, in part, based upon the fact that the last time Weber molested him, Krueger was booked for and featured in the Abercrombie & Fitch campaign by Weber.

55. After recruiting and enticing Krueger to come to his studio for a test shoot that could potentially advance his career, Weber sexually molested Krueger against his will, by forcing his hand onto Krueger's genitals, under the guise of a fraudulent breathing exercise and the fraudulent offer of future commercial success in the male modeling industry.

56. Weber did not cast Krueger in any future campaigns, or help him "go far," after the test shoot. In fact, he made no efforts to follow up with Krueger or work with him to advance his career.

**Jacob Madden**

57. At all material times, Jacob Madden ("Madden") was an aspiring model, residing in New York, NY.

58. In or about July 2009, Madden was invited to an Abercrombie & Fitch shoot by Bruce Weber. Madden was excited and hopeful for the opportunity to work with Weber, as this was his first shoot as a model.

59. Madden traveled from New York to Boston for the shoot.

60. Once at the shoot, after taking several photographs with a female model, Weber lured Madden away from the other models and told him he wanted to take some solo shots of Madden.

61. This invitation caused Madden to be hopeful that Weber would advance Madden's career in the modeling industry. Madden was excited and hopeful for the opportunity to have a one-on-one session with Weber during the shoot, and was well-aware that such a session could lead to Madden being prominently featured in the campaign.

62. Once Weber had recruited and enticed Madden away from the rest of the models, Weber engaged Madden in the fraudulent breathing exercise, and put his hand on Madden's chest.

63. Weber then told Madden that he should tuck in his shirt, and Bruce used his own hands to tuck in Madden's shirt. This was a fraudulent practice as Weber used the guise of tucking in Madden's shirt to fondle Madden's genitals.

64. Madden was visibly startled by the fondling and hoped that it was a mistake. Weber then looked at Madden and asked Madden "how far are you willing to go"? Weber then asked him "do you want to be a big model?"

65. Madden reasonably relied upon these statements by Weber, immediately following the fondling, as an offer to help Madden's career if he allowed Weber to molest him.

8

66. Madden stayed silent, frozen, and nervous. Weber then engaged in the fraudulent breathing exercise again and then forced his hand into Madden's pants and began fondling his genitals a second time.

67. In a state of panic, Madden continued to stay frozen and silent. Weber removed his hand from Madden's genitals, and told Madden that "he just needed to let loose if he wanted to make it to the top."

68. Once again Weber told Madden that he wanted to un-tuck his shirt, and this time Madden in a startled manner responded that he "would do it himself." Weber responded that he "was just trying to help him."

69. Madden withdrew from the situation and Weber did not take another photograph of Madden during the remainder of the shoot, nor did he have any further conversations with Madden, despite inviting multiple other male models to sit at his table with him at dinner.

**Jnana "Jason" Van Oijen**

70. At all material times, Jnana "Jason" Van Oijen ("Van Oijen") was an aspiring male model.

71. Van Oijen met Weber in 2008 in New York, New York at the Little Bear studio.

72. In or about 2009, Weber enticed and recruited Van Oijen to Gold Beach, Oregon under the guise of taking photos Weber. This invitation made Van Oijen hopeful that Weber would advance Van Oijen's career in the modeling industry. Weber had previously indicated to Van Oijen that Weber was considering him for future campaigns, and Van Oijen wanted to get more modeling work. During the shoot, Weber led Van Oijen to an alley on the side of his house and took him through his "breathing exercises" which ended in Weber groping Van Oijen's genitals. Weber told Van Oijen that this is what it would take to "get further" in the industry.

73. In or about 2010, Weber enticed and recruited Van Oijen to his house in Montauk, New York. Van Oijen was nervous about seeing Weber again, but he feared rejecting Weber would be detrimental to his career. Weber started taking

photos of Van Oijen outside his home and directed Van Oijen to pull his pants down lower and lower until Van Oijen was completely naked. During the shoot, Weber mentioned that he was considering Van Oijen for other jobs. As he had previously done, Weber led Van Oijen through his "breathing exercises" which ended in Weber groping Van Oijen's genitals.

74. Van Oijen reasonably relied upon Weber's statements that he was considering him for future modeling work and helping Van Oijen "get further" in the industry, as an offer to help Van Oijen's career if he allowed Weber to molest him.

## V. DAMAGES

75. As a direct result of the sexual assaults by Weber, Ardolf has suffered, and continues to suffer, from depression, anxiety, anger, and difficulty in his personal relationships.

76. Further, Ardolf became fearful in the modeling industry that a similar assault would reoccur, and still suffers from flashbacks of his traumatic experience.

77. As a direct result of the sexual assaults by Weber, Baldwin has suffered, and continues to suffer, from depression, anxiety, flashbacks, nightmares, and PTSD.

78. Further, Baldwin lost his ability to trust photographers and others with influence in the modeling industry, and thus had to give up his modeling aspirations.

79. As a direct result of the sexual assaults by Weber, Krueger has suffered, and continues to suffer, from depression, anxiety, substance abuse, flashbacks, nightmares, and general loss of enjoyment of life.

80. Further, Krueger lives in constant dread and regret that any success he achieved in his modeling career was the result of him exchanging non-compliant sex acts for promises of commercial/career gain.

81. As a direct result of the sexual assaults by Weber, Madden has suffered, and continues to suffer, from depression, anxiety, substance abuse, loss of self-esteem, flashbacks, and general loss of enjoyment of life.

82. As a direct result of the sexual assaults by Weber, Van Oijen has suffered, and continues to suffer, from anxiety, depression, shame, difficulty in personal relationships, and general loss of enjoyment of life.

83. Further, Van Oijen has given up his pursuit of a career as a photographer and a model, as he has become insecure and fearful of the industry.

## COUNT I
## Violation of The Trafficking Victims Protection Act 18 U.S.C. §1591
## (All Plaintiffs)

84. Plaintiffs repeats and re-allege each and every allegation set forth in paragraphs 1-83 as if set forth in full herein.

85. Weber recruited and enticed Plaintiffs by initiating a professional relationship with them, and then inviting them to and/or booking them for auditions, test shoots or other photoshoots and casting calls. These invitations caused hope and desire for career success in Plaintiffs, who were aspiring male models.

86. Mr. Weber's *modus operandi* was to sexually touch and/or fondle male models during one-on-one photoshoots, under the guise of directing the photoshoot and/or otherwise offering creative direction. One of his common practices was to engage in "breathing exercises" with the models. Another common practice was to engage in styling and/or positioning of the models' clothing.

87. Mr. Weber's *modus operandi* of using breathing exercises to fondle models' genitals, and of using his position as the photographer and director of photoshoots to otherwise engage in touching with models, was for the purpose of his own sexual gratification.

88. At the outset of his professional relationship with Plaintiffs, Weber knew that he would make fraudulent and enticing offers for professional opportunities and career success. He knew that he would engage in fraudulent photography practices to sexually touch Plaintiffs. He knew that he would make fraudulent promises and offers of career success to convince Plaintiffs to allow the molestation to take place and/or to believe that the molestation was part of the modeling process.

89. At the outset of their professional relationship, Weber knew that he would use force to convert the fraudulent photography practices to sex acts with Plaintiffs.

90. Plaintiffs complied with the fraudulent breathing exercises and/or touching because they believed it was part of the photoshoot. They believed Mr. Weber that they had to engage in these practices in order not to look "tense" for the photoshoot, and/or to succeed professionally. They also believed that Weber had the power to blacklist them.

91. Weber would then force a sex act on Plaintiffs.

92. On information and belief, the combination of the fraudulent photography practices and empty promises of career advancement was routinely utilized by Weber to engage in sex acts with aspiring models. In fact, Weber used this precise fraud to engage in commercial sex acts with multiple male model victims. This was Bruce Weber's *modus operandi.*

93. Weber's *modus operandi* of using fraudulent photography practices to fondle models' genitals was for the purpose of his own sexual gratification.

94. Weber intended that his fraud and force cause a sex act to take place.

95. Weber invited Plaintiffs to meetings, test shoots or other photoshoots, video chats, auditions, and/or casting calls with him, which in itself were things of value for Plaintiffs.

96. A photoshoot with Weber, an audition with Weber, and a casting call with Weber were all of considerable value for an aspiring male model.

97. For Plaintiffs, and any other aspiring male model, any photography session with Weber was the ultimate opportunity and carried enormous value.

98. During the meetings, test shoots or other photoshoots, video chats, auditions, and/or casting calls, Weber made material promises and assurances that Weber could and would help Plaintiffs' careers if they complied with what Weber wanted them to do.

99. Weber's promises were made in relation to the male modeling industry, which affects interstate commerce.

100. Due to Weber's power and prominence in the industry, Plaintiffs reasonably relied upon the promises and offers made by Weber. In fact, Plaintiffs only accepted the invitations by Weber because they understood the invitations to be an opportunity for career advancement and commercial gain.

101. It was well-known in the industry that all Weber had to do was choose a particular model for a prominent campaign and that model would achieve immediate success.

102. Once he had knowingly enticed Plaintiffs to appear at the meetings, test shoots or other photoshoots, auditions, and/or casting calls, Weber then engaged in a commercial sex act with Plaintiffs by forcibly and fraudulently fondling their genitals for sexual gratification under the fraudulent guise of a breathing exercise-turned-forced-fondling, and in exchange for fraudulent promises of career advancement.

103. Weber's exchange of modeling opportunities both real and fraudulent in exchanged for sex acts has a substantial effect on interstate commerce.

104. As a result of Defendant Bruce Weber's heinous and willful conduct, Plaintiffs are entitled to compensatory damages, punitive damages, attorney's fees, costs, and all other appropriate relief.

## **PRAYER FOR RELIEF ON CLAIMS**

WHEREFORE, Plaintiffs pray that this Court:

A.   Award Plaintiffs all of their damages under The Trafficking Victims Protection Act 18 U.S.C. §1595, the civil remedy for violation of The Trafficking Victims Protection Act 18 U.S.C. §1591, and common law, including compensatory damages and punitive damages in an amount to be determined at trial.

B.   Award Plaintiffs all attorney's fees, costs and expenses available under law;

C.   Award Plaintiffs all pre-judgment interest and post judgment interest available under law; and

D.     Award Plaintiffs such additional and further relief as this Court may deem just and proper.

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable of right by jury.

DATED: March 29, 2019          Respectfully submitted,

**THE BLOOM FIRM**

By: /s/ Arick Fudali
Lisa Bloom
Arick Fudali
Anna Levine-Gronningsater
Sarah Bloom
Attorneys for Plaintiffs
**Ardolf, Baldwin, Krueger, Madden, Van Oijen**